# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BIRDA J. MARSHALL** | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **CONNECTICUT GENERAL LIFE** | : | **NO. 02-3662** |
| **INSURANCE COMPANY** | : | |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT OF DEFENDANT,
## CONNECTICUT GENERAL LIFE INSURANCE COMPANY

Defendant, Connecticut General Life Insurance Company ("Connecticut General" or

"Defendant"), by and through its attorneys, White and Williams LLP, respectfully submits this

Statement of Material Facts in Support of Motion for Summary Judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure, LR 7.1 of the Local Rules of the United States District

Court for the Eastern District of Pennsylvania and the Motion Practices and Procedures of the

Honorable Legrome D. Davis and, in support thereof, avers as follows:

## I.    INTRODUCTION AND PROCEDURAL HISTORY

1.    Plaintiff, Birda J. Marshall ("Marshall" or "Plaintiff"), filed her Complaint in the

above-captioned matter on or about June 7, 2002, against Connecticut General[1] seeking, *inter*

*alia*, long-term disability benefits pursuant to the Employee Retirement Income Security Act of

1974 ("ERISA") for the purported wrongful denial of benefits.  A copy of Plaintiff's Complaint

is attached as Exhibit "1."

2.    Plaintiff alleges in her Complaint that she is entitled to benefits as an employee of

Lucent Technologies, Inc. ("Lucent") under a group long-term disability plan (the "Lucent LTD

---

[1]    Plaintiff's Complaint originally also named Lucent Technologies, Inc., Lucent Benefit Trust and CIGNA Insurance Company as Defendants, but these entities were voluntarily dismissed by Plaintiff, (and her demand for a jury trial withdrawn), by Stipulation filed on July 17, 2002.

Plan") offered by her employer and funded by the Lucent Benefit Trust ("Lucent Trust"). Plaintiff's Complaint, ¶¶ 4, 7, 8 and 11.

     3.     Plaintiff further asserts that Lucent is the plan sponsor and plan administrator of the Lucent LTD Plan and that Lucent contracts some of its administrator duties under the Plan to Connecticut General. Plaintiff's Complaint, ¶¶ 8 and 9.

     4.     Plaintiff continues in her Complaint that she became totally disabled from her job as an aligner at Lucent on or about July 9, 2000, at which point she claims she left her employment at Lucent due to cervical spine issues, headaches, loss of balance, dizziness, nausea, and pain and numbness in her hands, arms and neck. Plaintiff's Complaint, ¶¶ 13 and 17.

     5.     She claims that she submitted an application for short-term disability benefits to Lucent and was paid short-term disability benefits by Lucent for a period of 52 weeks. Plaintiff's Complaint, ¶ 14.

     6.     She continues, however, that her attempts to be placed on long-term disability pursuant to the Lucent LTD Plan have been repeatedly rejected. Plaintiff's Complaint, ¶ 18.

     7.     The claims in Plaintiff's Complaint against Connecticut General are predicated upon a purported wrongful denial of long-term disability benefits under the Lucent LTD Plan. Plaintiff's Complaint ¶¶ 2, 5, 8, 13-14.

     8.     On July 12, 2002 Connecticut General filed an Answer and Affirmative Defenses to Plaintiff's Complaint, specifically and unequivocally denying, *inter alia*, that Connecticut General wrongfully refused to approve Marshall's long-term disability claim under the Lucent LTD Plan or is otherwise liable to Marshall. A copy of Defendant's Answer and Affirmative Defenses is attached as Exhibit "2."

DOCS_PH 1646597v1

9.  Thereafter, by Stipulation of counsel approved by Judge Davis on September 1, 2004, the Answer of Connecticut General was amended to clarify and confirm that Connecticut General provided administrative services *only* to the Lucent LTD Plan, including claims administrative services, and that it did *not* issue any policy of insurance which would provide benefits under the Lucent LTD Plan. There is no insurance applicable to the instant matter; rather, as averred by Plaintiff in her Complaint (¶ 2, above), the Lucent LTD Plan is funded by the Lucent Trust. A copy of the approved Stipulation of September 1, 2004 is attached as Exhibit "3."

## II.    THE TERMS OF THE LUCENT LTD PLAN

### A.    The Lucent Long Term Disability Plan for Occupational Employees Summary Plan Description

10.  As an employee of Lucent, Marshall was an eligible employee under the Lucent LTD Plan covering certain occupational employees of Lucent. A copy of the applicable Lucent Long Term Disability Plan for Occupational Employees Summary Plan Description is attached as Exhibit "4," and Bates-numbered CBM00001-00023.[2]

11.  The Lucent LTD Plan sets forth its "Eligibility for Benefits" requirements, in pertinent part, as follows:

> ### *Eligibility for Benefits*
>
> To receive LTD benefits, you do not have to be hospitalized or confined to a home, but you must meet the following requirements:
>
> - You must be considered disabled under the LTD Plan. **This may differ from being considered disabled for purposes of the Sickness and Accident Disability Benefit Plan,** Lucent Technologies Inc. Pension Plan, workers'

---

[2]    The administrative records/claims file and Lucent LTD Plan Summary Plan Description applicable to Marshall's claim are authenticated by and attached to the Declaration of Richard Lodi, a Senior Operations Specialist for Connecticut General, submitted separately as an Appendix to this Motion and Bates-numbered CBM00001-00481.

compensation, Social Security or other benefits you might
be entitled to under a private insurance plan.

- **You must have been disabled for 52 weeks**, receiving
  sickness disability benefits under the **Sickness and
  Accident Disability Benefit Plan**.

- **You must be unable to do any job for any employer for
  which you're qualified**, or may reasonably become
  qualified by training, education or experience, other than
  one that pays less than 50% of your **eligible base pay** at the
  time you became disabled.

- **At all times during your disability, you must be under a
  physician's care and following the recommended care
  and course of treatment** to receive benefits.

- You may be required to submit proof of your disability to
  the Claims Administrator from time to time.

- **The Claims Administrator will determine the extent of
  your disability based on medical evidence** and reserves
  the right to have a physician of his or her choice examine
  you.

See Lucent LTD Plan SPD, attached as Exhibit "4," **Eligibility for Benefits**, p. 11 (CBM00011),
(emphasis supplied).

12.    Notably, the Lucent LTD Plan has a benefit waiting period that *requires* that an
eligible employee "must" be "disabled for 52 weeks" and receive 52 weeks of short-term
disability benefits under the Lucent Sickness and Accident Disability Benefit Plan before being
eligible for benefits under the Lucent LTD Plan.  The Plan warns, however, that being
considered "disabled" under the Lucent Sickness and Accident Disability Benefit Plan or under
Social Security "may differ" from "disability" under the Lucent LTD Plan.  Further to be
considered "disabled" under the Lucent LTD Plan the employee *"must be unable to do **any job**
for **any employer** for which ... qualified" and "[a]t all times during [the] disability must be*

*under a physician's care and following the recommended care and course of treatment to receive*

*benefits." Id.*

13.    The Lucent LTD Plan also provides:

***When Coverage Ends***

Your eligibility for LTD Plan benefits ends when you leave the company for any reason other than for a disability covered under the LTD Plan.

See Lucent LTD Plan SPD, Exhibit "4," **Eligibility and Participation**, p. 7 (CBM00007).

14.    The Lucent LTD Plan further provides that:

If, while you're disabled, you are able to work for an employer other than the company, in a job that pays 50% or more of your previous eligible base pay, you're no longer covered by the LTD Plan.

See Lucent LTD Plan SPD, Exhibit "4," **Employment While You Are Disabled**, p. 4

CBM00012

15.    Importantly, the Lucent LTD Plan provides **express discretionary authority** as

follows:

***LTD Plan Sponsor and Administrator***

The LTD Plan Administrator has the full discretionary authority and power to control and manage all aspects of the LTD Plan, to determine eligibility for LTD Plan benefits, to interpret and construe the terms and provisions of the LTD Plan, to determine questions of fact and law, to direct disbursements, and to adopt rules for the administration of the LTD Plan as they may deem appropriate in accordance with the terms of the LTD Plan and all applicable laws.

The Plan Administrator may allocate or delegate its responsibilities for the administration of the LTD Plan to others and employ others to carry out or render advice with respect to its responsibilities under the LTD Plan, including discretionary authority to interpret and construe the terms of the LTD Plan, to direct disbursements, and to determine eligibility for LTD Plan benefits.

See Lucent LTD Plan SPD, Exhibit "4," **LTD Plan Sponsor and Administrator**, p. 16-17, (CBM00016-17).

16.    In fact, Lucent did allocate/delegate its responsibilities for claims administration of the Lucent LTD Plan, including such discretionary authority, to Connecticut General, a CIGNA company. See Lucent LTD Plan SPD, Exhibit "4," **Administrative Information**, pp. 14 and 23, (CBM00014 and 00023), and the Declaration of Richard Lodi, Senior Operations Specialist, submitted with the Appendix to this Motion.

17.    Connecticut General provided the claims administrative services, however, any LTD benefits payable pursuant to the Lucent LTD Plan would be through the Lucent Technologies Inc. Long Term Disability Plans Benefit Trust, i.e. the Lucent Trust. "LTD Plan benefits are not insured." Connecticut General, a CIGNA company, "only provides administrative services." See Lucent LTD Plan SPD, Exhibit "4," **Plan Funding and Payment of Benefits**, p. 16 (CBM00016) and Declaration of Richard Lodi, Senior Operations Specialist.

III.    **THE CLAIM RECORD, PLAINTIFF'S MEDICAL HISTORY AND HER CLAIM FOR DISABILITY BENEFITS UNDER THE LUCENT LTD PLAN AS PRESENTED TO CONNECTICUT GENERAL**

    A.    **Plaintiff's Claim to Connecticut General For Long Term Disability Benefits**

        1.    **Initial Claimant and Employer Contacts**

18.    On March 6, 2001, Marshall's employer, Lucent, submitted to Connecticut General an Employer's Statement of Claim regarding a potential claim for long-term disability benefits by Marshall under the Lucent LTD Plan. In this Employer's Statement it is indicated that Marshall had been absent since "7-9-00" and that her 52-week benefit period for short-term disability benefits under the Lucent Sickness and Accident Disability Benefit Plan would expire

on "7-6-2001." The condition causing disability was given as "Sick" and Marshall's job title was listed as "Operator" with an "Occupational Job Description" of this job title acquired. See Employer's Statement of Claim and Occupational Job Description, attached as Exhibit "5," (CBM00473-474).

19.     Connecticut General then wrote to Marshall on March 16, 2001 acknowledging receipt of the Statement from the employer and requesting specific information from her, including an Employee Statement, Disability and Social Security Questionnaires, and an Attending Physician's Statement. Marshall was asked to respond by April 9, 2001. See correspondence from Connecticut General to Marshall dated 3/16/01, attached as Exhibit "6," (CBM00471-472).

20.     Having received no response from Marshall, Connecticut General wrote to her again on April 23, 2001 requesting information to process her claim. See correspondence from Connecticut General to Marshall dated 4/23/01, attached as Exhibit "7," (CBM00470).

## 2.    Marshall Unresponsive; Claim Denied

21.     With over 60 days having gone by with no response from Marshall, Connecticut General wrote to her again on May 21, 2001, advising that her application for long-term disability benefits was being DENIED. See correspondence from Connecticut General to Marshall dated 5/21/01, attached as Exhibit "8," (CBM00454-455).

## 3.    Marshall's Statement Belatedly Received; Claim Reinstated

22.     Thereafter, Connecticut General received an Employee's Statement of Claim signed by Marshall on May 31, 2001 and re-opened her claim. In this Statement Marshall describes her condition causing disability as "Headaches, Nausea, dizziness, Neck Pain." She writes that her condition first appeared on "6/27/01" and that she first became totally disabled on

"7/9/01," (although these dates do not make sense in the context of her claim). She lists her physicians as Dr. Joseph Kang, Dr. Perkins, Dr. Lutz and Dr. Robert O'Reilly. She also indicates that she will be receiving Social Security benefits in the amount of $873.00 monthly beginning in July, 2001.

With her Statement of Claim Marshall enclosed executed Reimbursement Agreements and an Authorization to Release Information, as well as a Social Security Notice of Award, which, significantly, indicates that Social Security found her to be disabled under its rules not on "7-9-00," the date indicated on the Employer Statement, *supra*, but rather, on "**January 25, 2001**," i.e. over six months later. See Employee's Statement of Claim with accompanying documents, including Social Security Notice, attached as Exhibit "9," (CBM00451, 446-450 and 438).

23.    Connecticut General made its LTD Initial Telephone Contact with Marshall on June 7, 2001 at 2:47 p.m. The Lucent LTD Plan's definition of disability and other provisions were explained to Marshall. Evelyn Flores, M.D., a neurologist, was identified as a treating physician for the primary diagnoses of "headaches, nausea, dizziness and neck pain." See Initial Telephone Contact Checklist, attached as Exhibit "10," (CBM00442-445).

24.    On the same date, June 7, 2001, Connecticut General wrote to Marshall advising that information was being requested from the physicians she had identified and asking that she complete a Disability Questionnaire and promptly return it. See correspondence from Connecticut General to Marshall dated 6/7/01, attached as Exhibit "11," (CBM00440-441).

25.    Next, on June 13, 2001 Connecticut General contacted Plaintiff's employer, Lucent, requesting records, evaluations, consultation reports or Functional Capacity Evaluations

done regarding Marshall.  See request to Lucent dated 6/13/01, attached as Exhibit "12,"
(CBM00413).

26.    On the same date, June 13, 2001, Connecticut General also wrote to Marshall's
various healthcare providers, including Drs. Kang, Lutz, Perkins and O'Reilly, requesting copies
of office notes, as well as other pertinent information and Physical Ability Assessments.  See
physician requests, attached as Exhibit "13," (CBM00414-420, 422-425, 427-430, 432-435).

### 4.    Lucent Medical Absence Records Summary; Functional Capacity Evaluation Report

27.    Plaintiff's employer, Lucent, faxed back to Connecticut General on June 13,
2001, a copy of their employee's Medical Absence records dated July 9, 2000 to June 13, 2001.
These records reveal that Marshall originally left work on July 20, 2000 with a complaint of a
persistent headache.  Concerned that the headaches might be caused by stress, Marshall was
originally prescribed Prozac, as of August 2, 2000, for the headaches.  By that date, however, she
was reporting that the headache was more of a "nagging pressure" but "not really achey."
Marshall stated that "it is really hard to explain" and that medication relieved the headache but
that it would come back again.  By September 7, 2000, Marshall was still on Prozac but was also
started on Cyclobenzaprine which she reported as "helping."  Her headaches were still there "but
not quite as bad and she doesn't have them everyday anymore."  By September 13, 2000
Marshall was told that an MRI revealed a "bulging cervical disc" and she was being referred to a
neurosurgeon.  That neurosurgeon, Dr. Perkins, apparently told her on September 20, 2000 that
he was unsure of her exact problem.  She was also seeing Dr. Flores, a neurologist, for headaches
and dizziness at that point, too.  She also complained of pain in the left foot and numbness and
tingling in her left leg.

By October 6, 2000 Marshall was advising that she still had dizziness and headaches but that "the headaches aren't quite as bad." When asked what was disabling her at that point, she stated the "dizziness and pain." Shortly thereafter, on October 10, 2000, Marshall was complaining that her whole body hurt, but that she was "having less dizziness and fewer headaches, both only one to two per week." She also continued to note pain in her left foot. The assessment then was "improved dizziness and headaches, body pain, plantar fasciitis."

On October 23, 2000 she returned to her Employer's Medical Department complaining of something wrong with her neck and that she was continuing with headaches because of the neck pain. She also complained of foot pain but said she "uses just Tylenol for relief." By October 25, 2000 a Carotid Doppler had come back normal and the employer was questioning as to what was really disabling this employee. Marshall at that time was apparently canceling physicians appointments.

On November 8, 2000 Marshall advised that she had seen Dr. Kang because both of her thumbs had "locked up on her." Surgical procedures on her thumbs by Dr. Perkins were scheduled. She continued to complain of dizziness and headaches. She went on to have a surgical repair of her right locked thumb on November 30, 2000 and on her left thumb on January 23, 2001. She apparently then had a period of physical therapy for her thumbs and range of motion was good. She continued to complain of dizziness and headaches however, and was referred for Vestibular Therapy which, by February 15, 2001, she reported was not helping her. At that point, the headaches were thought by Dr. O'Reilly to be a type of migraine. Dr. Flores was treating her for migraines and gave her a different medication to try on February 19, 2001. Marshall then reported not having a migraine for a week, but still having nausea and dizziness although admitting that "[s]omedays" she is "without the dizziness," and thus reportedly

-10-

thoroughly confusing her Employer's Medical Department. She also complained of neck pain

due to arthritis and was prescribed Flexoril but was not using it. Marshall could not explain why

she was not using the medication prescribed.

On February 22, 2001 the Employer's Medical Department described Marshall's history

relative to her medical absence/short-term disability claim as follows:

> EE was treated for sinusitis and bronchitis in late June. A few
> weeks later EE started experiencing severe generalized headaches
> ONLY. It was felt it may be from the sinuses but a CT scan and
> labs showed nothing. EE was treated with Tylenol #3 and Fiorinal
> without relief. It was then suspected the HA was from stress and
> Prozac was rx which the EE took for 3-4 weeks without relief. EE
> states she never felt "stressed" and the counseling that was
> suggested was never done. A cervical CT scan, cervical x-ray and
> an MRI of the head showed a cervical bulging disc, arthritis and a
> normal brain respectively. EE was referred to a neurologist, Dr.
> Flores, who rx Flexeril 10 mg qid without relief. EE was referred
> to a neurosurgeon, Dr. Perkins, who ordered a bone scan which
> showed arthritis. EE was referred to a vascular surgeon, Dr. Amin,
> who obtained a normal carotid doppler and discharged EE. In
> January EE was referred to an ENT, Dr. Lutz, who tested EE and
> Dx her with an "inner ear problem." EE participated in vestibular
> therapy without relief. Dr. Lutz referred EE to Dr. O'Reilly, a
> specialist in Darby, at the Hearing & Balance Center who tested
> EE and suggested her problem is migraines and referred her back
> to the neurologist, Dr. Flores. EE saw Dr. Flores on 2/19/01 who
> rx Imitrex tablets and wants to see her back in two months.

At that time, Marshall was indicating that she was "eager to come back to work." She

claimed she could come back to work if she did not get the headaches and dizziness and admitted

that she can "cook, clean, drive, etc. as long as she doesn't have the severe HA." Dr. Kang

admitted to the employer on February 27, 2001 that he ordered a Functional Capacity Evaluation

because "I have no clear idea of diagnosis. Dizziness is such a subjective symptom." On the

same date, Dr. Perkins advised that he viewed the cervical MRI films which indicated

degenerative disc disease at three levels and a bulging disc, but felt that *Marshall's headaches*

*and dizziness were difficult to relate to the cervical spine. Marshall herself advised on March*

-11-

*19, 2001 that Dr. Perkins did not think her headaches and dizziness were neck-related.* Marshall indicated on that same date when asked whether she thought she could come back to work that "I don't know but I'm willing to try."

As of April 17, 2001 Marshall had been out of work for approximately 283 days due to alleged headaches and dizziness. An MRI of the internal auditory canals was reported normal as of that date. A Functional Capacity Evaluation had been completed which recommended physical therapy for the cervical spine. By May 15, 2001, Marshall was advising that she "hoped" to get long-term disability when asked about her feelings regarding return to work. At that point she was not scheduled to see Dr. Flores for another three months, because, she claimed, "there's nothing she can do for me." See Medical Absence Records from Lucent, attached as Exhibit "14," (CBM00401-412 and 361-391).

28.    Included in the records from Lucent was the "[e]ssentially negative MRI of the brain" of 3/7/01. See Exhibit "14," (CBM00387).

29.    Also included with the records from Lucent was the Functional Capacity Evaluation Summary Report dated March 21, 2001 concluding, *inter alia*, that Marshall's "job primarily requires constant sitting, and she does not have difficulty with this," although it goes on to report that she does have difficulty sitting with her head bent forward and working overhead. Additional therapy was recommended in order to facilitate her return to work. See FCE Evaluation Summary Report of 3/21/01, included as part of Exhibit "14," (CBM00382-386). Also see more on FCE below at ¶ 38.

30.    Lucent's records also contained a Healthcare Provider's Report by James Kline, M.D. dated August 1, 2000, wherein he described Plaintiff's illness as "chronic headaches-etiology unclear." His diagnosis was given as "headaches with a secondary diagnosis of

-12-

depression, perimenopause." As for Marshall's recommended return to work date he responded "re-eval in 3 wks." See Dr. Kline's report dated 8/22/00, included as part of Exhibit "14," (CBM00373).

31.     Another Healthcare Provider's Report from Dr. Kline, dated October 16, 2000, continued to describe the chronic headaches but also added the cervical findings, and indicated that Marshall had been referred for evaluation to Dr. Perkins and Dr. Flores, a neurologist. See Dr. Kline's report dated 10/16/00, included as part of Exhibit "14," (CBM00371).

32.     **Evelyn R. Flores, M.D.**, the neurologist, also provided Lucent with a Healthcare Provider's Report, dated April 17, 2001. She listed her diagnosis as "headaches, chronic (secondary) c.spine disease and migraines, vertiginous, controlled with Imitrex". **Dr. Flores noted that in her opinion Marshall can work with limitations and suggested that Marshall be assigned "a job that does not require long periods of neck flex[ion] or extension." Dr. Flores does *not* indicate that Marshall is disabled from working.** See Dr. Flores' Healthcare Provider's Report dated 4/17/01, included as part of Exhibit "14," (CBM00364).

### 5.    Marshall's LTD Disability Questionnaire

33.     On June 19, 2001 Connecticut General received Marshall's Disability Questionnaire wherein Marshall described her symptoms as continuing to be dizziness, headaches, nausea and neck pain. She identified Dr. Flores and Dr. Kang as her physicians, saying she sees Dr. Flores every two or three months, and last saw Dr. Kang approximately three months ago. See Marshall's Disability Questionnaire received 6/19/01, attached as Exhibit "15," (CBM00358).

34.     Following that, on June 28, 2001 Connecticut General wrote to Marshall to advise that a decision on her claim would be made as soon as additional information was received from her physicians. Marshall was asked to contact Drs. Kang, O'Reilly and Flores and asked them to

provide the information that Connecticut General had requested of them.  See correspondence of 6/28/01, attached as Exhibit "16," (CBM00357).

### 6.   Medical Consultant/Occupational Consultant Review and Recommendation

35.   Connecticut General also reviewed this claim with a medical consultant on June 28, 2001, who "felt that medical documentation did not support TD/AO [total disability/any occupation]".  The Functional Capacity Evaluation on file was discussed with an occupational consultant in light of the Social Security's line of reasoning that Marshall did not become TD/AO until January/2001.  A suggestion that a Transferable Skills Analysis be completed was made.  See Current Case Plan, attached as Exhibit "17," (CBM00049).

### 7.   Updated Physician Records Received and Reviewed; Disability Not Supported

36.   On July 2, 2001 Connecticut General received a response from **Robert C. O'Reilly, M.D.** who indicated he only saw the patient on one date, February 12, 2001 and **could not opine as to her restrictions, limitations, disability status**, etc., advising Connecticut General to contact her other physicians for that information. Dr. O'Reilly also provided his report of February 12, 2001 following his evaluation of Marshall at the Hearing & Balance Center and advising that based on the clinical evidence he was "suspicious that the ENG [suggestive of a right peripheral site lesion] may be erroneous." He suspected that her vestibular response would be normal based on her normal neurologic exam (and it ultimately was).  He thought the headaches were compatible with atypical migraine and recommended a reconsult with a neurologist and anti-migrainous medications.  See records of Dr. O'Reilly, attached as Exhibit "18," (CBM00346-353).

37.   On July 16, 2001 Connecticut General received the records and report of **Joseph Kang, M.D.**  As of that date Dr. Kang had not seen Marshall since March 28, 2001.  Her

frequency of visits was given as "prn [as needed]." He listed as "unknown" the date Marshall could return to work, noting the "atypical migraine." As for the source of his information, he references the Functional Capacity Evaluation Summary Report. As for restrictions he has placed on Marshall he responds that she is to "act as tol[erated]," and as for his return to work planning, he responds that he will "re-eval response to current treatment."

Although asked to complete a Physical Ability Assessment Dr. Kang **does not** do so, indicating, instead, to "see FCE form" dated March 29, 2001. Dr. Kang included with his records the "normal" carotid duplex of 10/11/00, the "normal" transcranial doppler of the same date, the nerve conduction velocity studies (the clinical significance of which was reported as uncertain given the normal clinical examination) and the "essentially negative" brain MRI of 3/7/01. He also included a report of **Dr. Perkins** dated September 14, 2000, who indicates that **"I am not at all clear as to the cause of the headache, dizziness or leg numbness and I find it difficult to relate all this to disc bulging in the cervical spine," and that if the negative MRI report is accurate then "I will be surprised if this was a significant problem."** (CBM00331-332). Most significantly, Dr. Kang provides the report of **Dr. Flores**, dated April 17, 2001, wherein she advises that **"[a]s of [Marshall's] last visit 04/16/01 she has learned to treat the different aspects of her headache with Cyclobenzaprine 10 mg PRN and the Vertiginous Migraines with Imitrex 50 mg PRN."** (CBM00339-340). See the records and reports provided by Dr. Kang, attached as Exhibit "19," (CBM00325-345).

### 8. Transferable Skills Analysis: Jobs Found Meeting Requirements for Transferability

38.    A Transferable Skills Analysis was completed on July 5, 2001 and was based upon the Physical Abilities form completed at the Functional Capacity Evaluation of March 21, 2001, (which indicated that Marshall was able to sit for 5.5 plus hours (continuously), stand for

up to 2.5 hours (occasionally), and walk for 2.5 to 5.5 hours (frequently) in an eight hour day, as well as, having the ability to lift up to 20 lbs from floor to waist, up to 10 lbs from waist to overhead and up to 15 lbs horizontally on an occasional basis, along with crawling, kneeling, crouching, squatting and coordination of upper extremities on a continuous basis, stair climbing on a frequent basis, and balancing and ladder climbing on an occasional basis, allowing a "Sedentary" to "Light" work capacity). Noting Marshall's education, work history and her job description as provided by her employer, and noting that according to the Dictionary of Occupational Titles, the physical demands of her job are in a "Light" classification of work, **the Transferable Skills Analysis found five jobs, including Marshall's previous occupation, that were identified as meeting the requirements for transferability and that would take the most advantage of her skills, education, physical abilities and meet the salary requirements, all within a "Light" classification of work.** See Transferable Skills Analysis of 7/5/01, attached as Exhibit "20," (CBM00319-320).

### 9. Second Medical Consultant/Occupational Consultant Review and Recommendation

39.    On July 20, 2001 Connecticut General again reviewed the file with a medical consultant and occupational consultant. It was indicated that since jobs were identified that would replace 50% of Marshall's pre-disability salary, including her previous occupation title, the claim be denied. See Current Case Plan, attached as Exhibit "21," (CBM00048).

### 10. Additional Physicians' Responses

40.    On July 30, 2001 Connecticut General received the records and report of **P.G. Perkins, M.D**. In response to an inquiry as to when Marshall was released to return to work, **Dr. Perkins responded "was discharged on March 15, '01."** Dr. Perkins had not seen Marshall since March 15, 2001 and **responded that he could not answer as to her capacities and**

-16-

**limitations.** He explained that he had "discharged her from further care as there is nothing

further from a musculoskeletal point of view, can do." As for the requested Physical Ability

Assessment, Dr. Perkins responded "cannot fill out due to no F.C.E." Included with records

from Dr. Perkins was a letter report from **Ali Amin, M.D.** of September 28, 2000, wherein he

reports with respect to vascular questions that the **"[p]atient's symptoms seem to be vague and

not very specific. I doubt they are related to any of her vertebral basilar insufficiency

possibly related to inner ear or other etiologies."** The subsequent carotid duplex scan was

reported "normal." Also included with Dr. Perkins' records was the "normal" whole body bone

scan done on September 21, 2000, the cervical spine x-ray report of August 22, 2000 showing

moderate degenerative process in the C5-6 segments, a second "normal" brain MRI dated

September 6, 2000, an MRI of the cervical spine also dated September 6, 2000 noting the

degenerative disc disease of the cervical spine with disc bulging, and the report of **Dr. Perkins**

following same and noting that **"I am not at all clear as to the cause of the headaches,

dizziness or leg numbness and I find it difficult to relate all this to disc bulging in the

cervical spine."** See records and reports from Dr. Perkins received 7/30/01, attached as Exhibit

"22," (CBM00294-318).

### 11. Connecticut General's Determination: LTD Benefits Denied, Marshall Does Not Meet Definition of Total Disability Under Lucent LTD Plan

41. On August 20, 2001, Connecticut General wrote to Marshall, reviewing with her

the definition of disability and the requirements of the Lucent LTD Plan, summarizing in a

Medical Assessment the medical records received, the Functional Capacity Evaluation and the

Transferable Skills Analysis, and concluding that:

> Based on the medical documentation reviewed, we have
> determined that you do not satisfy the definition of total disability
> as stated in your [plan]. While you do have headaches and

-17-

dizziness, you are able to treat these conditions with medication. You show evidence of restrictions with your neck due to cervical bulges. However, these would not preclude your ability to perform other work. Based on the restrictions provided by the Functional Capacities Evaluation, **you retain the ability to perform other work**. We are therefore unable to give favorable consideration to your claim.

See Connecticut General's determination letter of August 20, 2001, attached as Exhibit "23," (CBM00289-292).

### B.    Marshall Appeals With Attorney Assistance

#### 1.    Appeal Received and Acknowledged; Additional Medical Documentation Requested

42.    Thereafter, on November 2, 2001, Connecticut General received correspondence from Neil Sagot, Esquire, advising that he had been retained to represent Marshall with respect to her LTD claim and requesting an appeal from the denial of benefits. See Sagot correspondence of 10/30/01, attached as Exhibit "24," (CBM00281-282).

43.    In response, on November 28, 2001 Connecticut General wrote to Marshall acknowledging receipt of the appeal and, *inter alia*, asking whether there was any additional medical documentation Marshall wished to submit to support the appeal, which Connecticut General advised it would be happy to include in its review. See Connecticut General correspondence dated 11/28/01, attached as Exhibit "25," (CBM00280).

44.    Receiving no response, Connecticut General next wrote to Marshall's counsel on December 21, 2001, requesting, *inter alia*, documentation verifying his representation and advising that a decision would be forthcoming in connection with the appeal. Again, it was noted that **"it is Ms. Marshall's responsibility to provide any additional information that she feels will support her appeal for long-term disability benefits."** See Connecticut General's correspondence of 12/21/01, attached as Exhibit "26," (CBM00278-279).

45.     On January 21, 2002, having yet to receive verification of counsel's representation or any additional documentation in support of the appeal, Connecticut General again faxed to Attorney Sagot a request for same. See note of 1/21/02, attached as Exhibit "27," (CBM00274).

46.     Finally, on January 15, 2002 Connecticut General received correspondence from Attorney Sagot enclosing medical records of Drs. Kang, Perkins, Flores, Lutz and O'Reilly, however, with the exception of the progress notes of Dr. Kang and the ENG report of January 16, 2001 (which Dr. O'Reilly had previously reported he was suspicious of as "erroneous"), **these were already a part of the administrative record previously reviewed**. See correspondence of Attorney Sagot dated 1/9/02 and received 1/15/02, with enclosures attached as Exhibit "28," (CBM00162-273).

### 2.     Appeal Team Referral and Review: Appeal Denied

47.     Connecticut General completed an Appeal Review, on Appeal Team Referral, on December 26, 2001. This review concluded that the documentation on file indicated that Connecticut General had not been provided with documentation that supports claimant's inability to perform her occupation as a production operator. Dr. Flores had previously indicated that Marshall's restrictions consisted of no undue neck flexion/extension or lifting over 10 lbs as of June, 2001. These restrictions confirmed the results of her Functional Capacity Evaluation, and **no additional information regarding Marshall's functionality had been provided on appeal**. Accordingly, the appeal was being denied. See Appeal Team Referral/Appeal Review attached as Exhibit "29," (CBM00159-161).

48.     On January 29, 2002 Connecticut General wrote to Marshall, again summarizing pertinent portions of the Lucent LTD Plan defining disability under said Plan, summarizing the medical documentation through Medical Assessment and, in summary, concluding as follows:

-19-

A review of the documentation on file shows that we have not been provided with documentation that supports you inability to perform any occupation. Dr. Flores previously indicated that your restrictions consist of no undue neck tension/flexion or lifting over 10 pounds. These restrictions were confirmed by the results of the Functional Capacity Evaluation and to date no additional information has been provided that refutes your level of functionality. Based on these restrictions, your education, work history and training, suitable occupations were identified. On appeal, we have not been provided with any documentation that supports your inability to perform those above-mentioned occupations. We are not disputing that you may be limited in some way, we are simply stating that your limitations don't preclude you from performing other occupations. As a result, we are unable to render a favorable decision and your appeal has been denied.

See Connecticut General denial letter of 1/29/02, attached as Exhibit "30," (CBM00155-158).

### C.    Attorney Files Second Appeal, Threatens Suit and Files Suit Before Second Appeal Review Completed

#### 1.    Duplicate Medical Information Submitted; Social Security Explanation

49.    Thereafter, on March 5, 2002 Connecticut General received correspondence from Attorney Sagot enclosing the Social Security Administration's file and asking for review of that file, threatening a lawsuit if Connecticut General continued to uphold its denial of Marshall's claim. The medical records and reports received, however, again duplicated the medical documentation already contained in Marshall's administrative record/claims file with Connecticut General. Said medical records and reports are not repeated as an Exhibit hereto, but are included in the Appendix submitted herewith and numbered CBM00066-152.

Of particular note, however, and attached hereto as Exhibit "31," is the correspondence received from the Social Security Administration that Attorney Sagot provided, dated April 9, 2001, wherein the **Social Security Administration** advises, *inter alia*, that "[b]ased on all available evidence, your conditions did not prevent you from working until January 25, 2001."

**"We realize that your condition kept you from doing your job as an aligner, but it did not keep you from doing other jobs not requiring repetitive use of your hands. Based on your age of 54 and 12th Grade education, you could have done other work. We have therefore concluded that your disability began on January 25, 2001 and not July 9, 2000 as claimed."** See Social Security Administration Claim Information letter, attached as Exhibit "31," (CBM0069-70).

50.    In response, Connecticut General wrote to Marshall on March 8, 2002 acknowledging receipt of the additional information and advising that the claim would be forwarded to the Disability Appeals Team in Dallas, Texas. See Connecticut General correspondence of 3/8/02, attached as Exhibit "32," (CBM00064-65).

51.    Thereafter, on March 20, 2002, Connecticut General's Appeal Claim Examiner in Dallas, Texas contacted Marshall acknowledging the request for review of her claim and *again* asking that she execute an authorization allowing the company to speak with Attorney Sagot. Marshall was *again* asked to submit any additional information she wished reviewed. See Connecticut General correspondence of 3/20/02, attached as Exhibit "33," (CBM00475-76).

### 2.    Requested Information Not Forthcoming; Suit Filed Prior to Completion of Review

52.    Prior to Connecticut General's Dallas Appeal Team's review of Marshall's claim, and having submitted nothing further in support of the request for a second review, Attorney Sagot and Marshall filed suit on June 7, 2002.

## IV.    SUMMARY JUDGMENT IS APPROPRIATE

### A.    Scope of This Court's Evidentiary Review

53.    In reviewing Connecticut General's decision to deny Marshall's claim for disability benefits under the Lucent LTD Plan, this Court is limited to a review of the evidence

-21-

that was before Connecticut General at the time of its decision. 29 U.S.C. §1104(a)(1)(B),

Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997).

**B.    Abuse of Discretion Standard of Review**

54.    The discretionary, arbitrary and capricious standard of review, giving full

deference, is the appropriate standard to apply to this Court's review of this ERISA claim. The

Lucent LTD Plan vests in Connecticut General express discretionary and final authority to

determine eligibility for benefits and to construe and interpret the terms of the Lucent LTD Plan,

and all determinations and interpretations made by Connecticut General are conclusive and

binding.

**C.    Summary Judgment is Warranted on This Record**

55.    Connecticut General's decision in this matter was neither arbitrary nor capricious.

56.    Marshall failed to meet the requirements for Eligibility for Benefits as defined in

the Lucent LTD Plan as the evidence did not support the contention that Marshall was *unable to

do any job for any employer* for which she was qualified or might reasonably become qualified

because of her purported sickness. The medical evidence did not support disability from

performing any occupation and her own treating physicians did not restrict or limit her from

performing any occupation. Notably, the Social Security determination confirmed that Marshall

had not been disabled for 52 weeks as required by the Lucent LTD Plan. The denial of benefits

was proper and, therefore, summary judgment is appropriate.

57.    Connecticut General had Plaintiff's claim thoroughly reviewed through multiple

levels, by medical consultants and occupational consultants, and with the benefit of a Functional

Capacity Evaluation and a Transferable Skills Analysis.

58.    The claims decision was made on the record before Connecticut General, amply

demonstrating that Marshall did not meet the requirements for "Eligibility for Benefits" as

defined by the Plan and with a reasonable basis in fact supporting the decision, and, therefore, summary judgment is appropriate. There was no abuse of discretion here.

WHEREFORE, Defendant, Connecticut General Life Insurance Company, respectfully requests that summary judgment be granted in its favor, as its decision denying Plaintiff long-term disability benefits was reasonable and not arbitrary and capricious. For all the reasons set forth above and as more fully set forth in the Brief in Support of the Motion for Summary Judgment of Defendant, Connecticut General Life Insurance Company, submitted herewith, Defendant prays that judgment be entered in its favor, as a matter of law.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By: _____
       Elizabeth A. Venditta, Esquire
       Attorney I.D. No. 36000
       1800 One Liberty Place
       Philadelphia, PA 19103
       215-864-6392

       Attorneys for Defendant,
       Connecticut General Life Insurance
       Company

Dated: October 28, 2004

-23-

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BIRDA J. MARSHALL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CONNECTICUT GENERAL LIFE | : | NO. 02-3662 |
| INSURANCE COMPANY | : | |

### CERTIFICATE OF SERVICE

I, Elizabeth A. Venditta, counsel for Defendant, Connecticut General Life Insurance Company, hereby certify that on **October 28, 2004,** the foregoing Statement of Material Facts in Support of Motion for Summary Judgment of Defendant, Connecticut General Life Insurance Company, with proposed Order and this Certificate, were filed electronically and are available for viewing and downloading from the ECF system and, further, I caused a true and correct copy of same to be served upon the following counsel for the Plaintiff by placing same in the U. S. mail, first class and postage prepaid:

Stuart J. Phillips, Esquire
Phillips & Brooke, P.C.
Two Greenwood Square, Suite 225
3331 Street Road
Bensalem, PA 19020

**WHITE AND WILLIAMS LLP**

By: _Elizabeth A. Venditta_

Elizabeth A. Venditta, Esquire
Attorney I.D. No. 36000
1800 One Liberty Place
Philadelphia, PA 19103
215-864-6392

Attorneys for Defendant,
Connecticut General Life Insurance Company