IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BIRDA J. MARSHALL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CONNECTICUT GENERAL LIFE | : | NO. 02-3662-LDD |
| INSURANCE COMPANY | : | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Birda J. Marshall, by and through her counsel, Sagot, Phillips, Brooke & Cornett, P.C., hereby moves for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, and in support thereof states as follows:

1.   This case was instituted by Complaint filed in the Eastern District of Pennsylvania alleging a cause of action pursuant to 29 U.S.C. §1132 (e), 28 U.S.C. §1331 and/or the supplemental jurisdiction of the Court under 28 U.S.C. §1367.  (Plaintiff's Complaint is attached as Exhibit 1).

2.   Plaintiff sued Defendants for the improper and unlawful denial of long term disability benefits under a plan of insurance (hereafter "LTD Plan" or "LTD benefits"), maintained by her (former) employer, Lucent Technologies, Inc., (hereafter "Lucent").  (The LTD Plan is attached as part of the Administrative Record attached as Exhibit 4, @ pages CBM00001).

3.   Plaintiff was, at all relevant times, a Lucent employee and an eligible participant in the LTD Plan. (Exhibit 1 @ ¶s 7 and 8, and Defendant's Answer and Affirmative Defenses @ ¶ 8.  Defendant's Answer is attached as Exhibit 2).

4.   Defendant Connecticut General Life Insurance Company, (hereafter "CGLIC") is an administrator and fiduciary to the LTD Plan within the meaning of ERISA § 3 (21), 29 U.S.C.

1

§ 1002 (21), for the purpose of providing claims administrative services, including determination of eligibility for long term disability benefits , the interpretation of plan terms, and determination of appeals from benefit claim denials. (Exhibits 1 and 2 @ ¶ 10, and Exhibit 3 @ ¶ 3, amending Defendant's Answer to ¶ 9).

5.      In approximately June 2000, Plaintiff, while an employee of Lucent, began to have symptoms of severe headaches, dizziness, nausea and the inability to properly turn her head and neck.  She was subsequently diagnosed with herniated and bulging discs of the cervical spine and arthritis of the cervical spine.  (Exhibit 1 @ ¶s 12 and 17).

6.      On or about July 9, 2000, Ms. Marshall was determined to be totally and completely disabled and unable to perform the duties of her occupation.  Plaintiff then applied for short term disability benefits under a comparable (though not identical) plan sponsored by Lucent, and likewise administered by CGLIC.  This short term plan paid Plaintiff benefits of $445.20 per week for a period of fifty two (52) weeks.  (Exhibit 1 @ ¶s 13 and 14).

7.      Simultaneously, on her doctor's instructions, Plaintiff Birda J. Marshall applied for, and was granted Social Security Disability benefits by the Social Security Administration effective January 25, 2001.  (Exhibits 1 and 2 @ ¶s 15).  The Notice of Award by the Social Security Administration is part of the Administrative record herein and was available to Defendant in its determinations denying her LTD Plan benefits.  (Exhibit 4 @ CBM0166).

8.      Plaintiff Birda J. Marshall is, and has been, since leaving the course of her employment with Lucent Technologies, Inc., on July 9, 2000, totally and completely disabled and unable to perform any type of work whatsoever as evidenced by medical records and reports provided to the Defendant and to the Social Security Administration. See Exhibit 1 @ ¶ 16).

9. Plaintiff Birda J. Marshall properly applied for long term disability benefits and satisfied all administrative intra-appellate requirements pursuant to the terms of the LTD Plan. Plaintiff's application for LTD Plan benefits has nonetheless been repeatedly denied, and this matter is ripe for judicial review. (See Exhibits 1 and 2 @ ¶ 18).

10. Because the LTD Plan provides for express discretionary authority, the arbitrary and capricious standard of review is at least initially applicable to Plaintiff's cause of action

11. The Third Circuit has held that when reviewing a denial of benefits under ERISA §1132(a) (1) (B) the "whole" record consists of that evidence that was before the administrator when the decision was being reviewed. The parties have agreed that under ERISA and applicable decisional law, this case should be decided based upon the administrative record as it existed at the time of final denial.

12. Defendant's denial of LTD Plan benefits represents an arbitrary and capricious exercise of its administrative obligations, a breach of its discretion and of its fiduciary obligations to Plaintiff.

Accordingly, and for the reasons set forth in the accompanying Memorandum of Law, Plaintiff, Birda J. Marshall, moves for Summary Judgment pursuant to F.R.C.P. 56, awarding her full benefits under the Lucent LTD Plan from the date of her initial eligibility up to the present and continuing into the future for so long as she shall remains eligible, and for an award of counsel fees and costs.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**I.   FACTS**

In June of 2000, at age fifty-four, Ms. Birda Marshall, a long-time employee of Lucent Technologies, as well as its predecessor AT&T, experienced the onset of symptoms that made it impossible for her to continue in her employment.  Those symptoms consisted of severe sudden onset headaches that included dizziness, nausea and lightheadedness.  Later, she also experienced tingling and numbness radiating into her left leg and pain in her left foot.  Ms. Marshall applied for and obtained short term disability benefits under her employer-provided Sickness and Accident Disability Plan, ("STD"), administered by Defendant, CGLIC.  During the following year she sought medical treatment from a host of physicians who clearly experienced some degree of difficulty in arriving at a conclusive diagnosis, (Ex. 4/p. 00314-315). Ms. Marshall was subjected to a variety of diagnostic testing including X-rays, MRI's of her cervical spine, and of her brain (with Gadolinium), EMG/NCV testing, blood labs, a Carotid Duplex Scan, CAT Scan, as well as numerous additional tests performed at the direction of an ENT consult. A variety of therapeutic modalties were attempted, including a soft cervical collar, heating pad, physical and vestibular rehab therapies, and a range of medications, including, but not limited to, Celebrex, Cyclobenzaprine, Darvocet, Fiorinal, Nitran, Nortriptyline, Meclizine and Tylenol #3.  None of this care and treatment proved fully successful in alleviating her symptomology.

Plaintiff's radiograph of her cervical spine reflected degenerative changes at the C4-5, C5-6 levels.  This was confirmed and clarified by MRI, which showed disc bulges at C3-4 through C5-6, as well as foraminal narrowing and spondylosis. (Ex. 4/p. 00316-317). Ultimately, these diagnostic tests formed the basis for her diagnosis, but only as a result of

having ruled out other possible difficulties in the orthopedic, neurological, vascular, and ENT systems.  Plaintiff's eventual diagnosis consisted of headaches, dizziness and nausea secondary to bulging discs and cervical disc disease, along with migraine headaches. (Ex. 4/p. 00217).

While she derived some benefit from her prescriptions at different times and to varying degrees, she continued living under the cloud of not knowing when a severe and disabling headache would strike her, leaving her unable to function in any practical sense of the word. One of her consulting physicians, Dr. Philip Perkins, in a letter from September 2000, describes her dizziness and lightheadedness as "a very major problem for her." (Ex. 4/p. 00331-332).  Dr. Perkins goes on to elaborate that "the symptoms appear to be progressive and are relieved by Tylenol #3 and the dizziness especially, is aggravated by neck movement or sudden movements, even if she is lying down or sitting down." (emphasis supplied).

Dr. Perkins also completed an LTD evaluation at Defendant's request, (Ex. 4/p. 294-296), in which he indicates his opinion that Ms. Marshall's disability was evident effective the date of her first appointment with him, (9/14/00).  He discharged her from treatment some six months later as there was "nothing further from a musculoskeletal point of view" he could do. Her symptoms and her inability to return to her employment persisted.  In January, 2001, writing to Dr. Joseph Kang, ENT Specialist Charles Lutz, M.D. describes Plaintiff's symptoms as "lightheadedness, unsteadiness and a buzzy, strange sensation in the head but with no feeling of motion."  "Aggravating factors" include rolling to the left or right in bed, with dizziness starting "immediately with position change." Dr. Lutz specifically notes that Ms Marshall's symptoms are "severe," and "severely interferes with daily activities." (Ex. 4/p.00333-334, emphasis supplied).

Not one of her physicians indicated that her ongoing problems had been alleviated by either medication and/or therapy, could be considered to be 'under control,' or could be expected not to substantially interfere with Ms. Marshall's daily activities or employment.

At the direction of CGLIC, the STD plan administrators, Ms Marshall applied for and was awarded Social Security Disability benefits, effective January 25, 2001. This award was known to Defendant at the time of its denial of plan benefits and appears throughout the administrative record, (Ex. 4/ pps. 00069, 00166, 00389). Defendant's denial of benefits makes reference to the Award, but gives it no discernable weight in reaching the conclusion that Plaintiff is not "disabled" under the benefit plan.

During the spring of 2001, Ms. Marshall applied for her employer-provided Long Term Disability benefits, administered by Defendant, CGLIC. Had these benefits been granted, Ms. Marshall would have been entitled to receive a maximum benefit of up to 50% of her pre-disability earnings. Her pre-disability annual salary was $46,280.00 per year, which equated to $3,871.50 per month. Her gross monthly disability benefit therefore amounted to $445 per week, prior to allowable offsets, specifically Social Security Disability benefits. Beginning in August 2001, (for the July benefit month), SSD benefits were paid at the rate of $873 per month, which would result in a net amount of LTD payable to Ms. Marshall of approximately $243.54 per week.

Unfortunately, CGLIC saw fit to deny Ms Marshall's LTD benefit claim on the grounds detailed in a Denial Letter of August 20, 2001. (Ex.4/p.00289-292). CGLIC case manager, Ms. Karen DuVall, prepared this rejection of claim benefits. Subsequently, Plaintiff appealed and her claim was again denied. Plaintiff subsequently provided additional medical records and materials to Defendant, through counsel, under letter dated January 9, 2002, (Ex. 4/p. 00162).

Defendant acknowledged this submission in correspondence dated March 8, 2002, (Ex. 4/p. 00064-65), with assurances that the same would be reviewed and responded to promptly. Despite this, Plaintiff and her counsel received no further communication from Defendant whatsoever. The matter was subsequently put into suit and it is undisputed that Plaintiff exhausted all of her administrative remedies perquisite to bring this ERISA based action. (Exhibit 2 @ ¶ 18).

## II. APPLICABLE LEGAL STANDARDS

### A. SUMMARY JUDGMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.C.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In this ERISA-based disability matter, the facts are derived from the medical records and other documentary evidence contained in Defendant's administrative record of Plaintiff's claim. As a result, the parties are in agreement that this matter is ripe for review by this court on cross-motions for summary judgment.

**B. STANDARD OF REVIEW FOR ERISA DISABILITY ACTIONS**

The ERISA statute does not specifically set forth the standard of review for an action brought under § 1132(a) (1) (B) by a participant alleging denial of benefits. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1997). When a plan governed under ERISA provides the administrator with discretionary authority to determine eligibility for benefits under the plan, a district court reviews the determination under the arbitrary and capricious standard. See id. at 115. Under that standard, the administrator's interpretation of the plan "will not be disturbed if reasonable." Id. at 114. The scope of this review is narrow, and the court is not free to substitute its own judgment for that of the administrator to determine a participant's eligibility for plan benefits. George W. Mitchell v. Eastman Kodak Co., 113F.3d 433, 438 (3rd Cir. 1997). Accordingly, deferring to the plan administrator, a court will not reverse the administrator's decision unless it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya v. Hoffman-LaRouche, Inc., 2 F.3rd 40, 45 (3d Cir. 1993).

Since the Plan documents clearly indicate that the Plan Administrator "has full discretionary authority and power to control and manage all aspects of the LTD Plan," specifically including the determination of benefits eligibility, (Ex. 4/p.00016), this court should apply the arbitrary and capricious standard.

**III.   ARGUMENT**

Defendant's denial of Plaintiff's LTD benefits is violative of the arbitrary and capricious standard, referred to above, in that Defendant's denial of plan benefits is unsupported by substantial evidence and is erroneous as a matter of law. Defendant deliberately misconstrues certain medical evidence and is improperly selective of those items in the record it cites in

support of its decision. CGLIC's repeated denial of Ms. Marshall's claim is based on the wholesale disregard of the overwhelming medical evidence and diagnostic testing produced by five separate physicians, in favor of a blatantly self-serving Transferable Skills Analysis, ("TSA"), (Ex.4/p. 00319-320), along with an unsupported interpretation of a narrative comment in a letter from Plaintiff's neurologist to her family physician, and an isolated ambiguous reference in that same neurologist's Disability Report.

In its determination letter of August 20, 2001, (Ex. 4/p.00289-292), Defendant sets forth the Plan standards for claim approval, inter alia, as follows:

> "…you must be unable to do any job for any employer for which you are qualified, by training, education or experience, or
>
> "You must be unable to work…at any job other than one that pays less than half your annual base pay at the time you became disabled, and
>
> "….The Claims administrator…reserves the right to have a physician of its choice examine you."

In this letter, one of Defendant's primary bases for denying benefits is the TSA and its assertion that Plaintiff remained qualified for various enumerated occupations defined in the Dictionary of Occupational Titles. Specifically, those jobs were Ion Implant Machine Operator, Electronics Assembler, Printed Circuit Board Assembler, and Tester-Wafer Substrate. Turning first to the TSA, this analysis was prepared specifically at the behest of Defendant. Its author had a clear understanding of the standards necessary to preclude the claim and makes specific reference to meeting "the salary requirements for resolution of this claim." (See "Conclusions" in Ex. 4/p. 00320). This blatant bias gives the lie to any contention that Defendant's expert was acting independently or presenting an objective opinion. The TSA itself, (Ex. 4/p. 00319-320), was based primarily on a Functional Capacity Evaluation, ("FCE") (Ex 4/p. 00382-386) and Plaintiff's work history, with only minimal reference to

9

Plaintiff's diagnosis, and none whatsoever to the supporting medical record and related diagnostic testing. The TSA's recommendation of occupations which Plaintiff can ostensibly perform is patently absurd given an analysis of the actual skills definitions which make up those jobs. Specifically, from the cited Dictionary of Occupational Titles, http://www.oalj.dol.gov/libdot, those occupations are as follows (emphasis supplied):

> 590.382-018 EPITAXIAL REACTOR OPERATOR (electron. comp.)
> Controls and monitors operation of epitaxial reactor to deposit layer of semiconductor material, such as gallium arsenide or silicon, onto semiconductor wafer surface in production of electronic components, such as transistors, diodes, and integrated circuits, and tests sample processed wafers to evaluate epitaxial layer properties, such as thickness and resistivity, using testing equipment: Cleans semiconductor wafers, using cleaning equipment such as chemical baths and automatic wafer cleaners, to prepare wafers for deposit of epitaxial layer. Places wafers on wafer holder (suspector), using tweezers or vacuum wand, to load reactor. Pushes buttons, flips switches, turns dials, and observes gauges to set and adjust reactor temperature and gas pressure to specified levels and to start reactor cycle. Monitors temperature and gas gauges during processing cycle and turns dials to adjust temperature and gas levels. Tests epitaxial layer on wafers, using testing equipment, to evaluate thickness and resistivity of layer. Records production data in logbook and processing documents. Cleans and maintains equipment and work area. May compute production statistics, using calculator.
>
> 590.382-022 ION IMPLANT MACHINE OPERATOR (electron. comp.)
> Operates ion implanting machine to implant semiconductor wafers with gases, such as arsenic, boron, or phosphorus, to implant electrical properties in wafers: Turns valves, flips switches, and presses buttons to start and regulate flow of gases into implant machine. Places semiconductor wafers in holders, such as carousel, wheels, or $T3boats, $T1 using tweezers. Places loaded holder in machine and secures clamps. Presses buttons to start feeding and implanting process. Monitors gas gauges and meters and turns dials to adjust gases, following specifications, if required. Maintains processing reports. May test semiconductor wafers, using test equipment, to verify that voltage, current, and resistivity of implantation meet company specifications.
>
> 726.684-018 ELECTRONICS ASSEMBLER (comm. equip.; electron. Comp.; inst. & app.)
> Performs any combination of following tasks to assemble electronic components, subassemblies, products, or systems: Reads work orders, follows production drawings and sample assemblies, or receives verbal instructions regarding duties to be performed. Positions and aligns parts in specified relationship to each other in jig, fixture, or other holding device. Crimps, stakes, screws, bolts, rivets, welds,

10

solders, cements, press fits, or performs similar operations to join or secure parts in place, using handtools, power tools, machines, and equipment. Mounts assembled components, such as transformers, resistors, transistors, capacitors, integrated circuits, and sockets, on chassis panel. Connects component lead wires to printed circuit or routes and connects wires between individual component leads and other components, connectors, terminals, and contact points, using soldering, welding, thermocompression, or related bonding procedures and equipment. Installs finished assemblies or subassemblies in cases and cabinets. Assembles and attaches hardware, such as caps, clamps, knobs, and switches, to assemblies. Performs intermediate assembly tasks, such as potting, encapsulating, sanding, cleaning, epoxy bonding, curing, stamping, etching, impregnating, and color coding parts and assemblies. Tends machines that press, shape, or wind component parts. Adjusts or trims materials from components to achieve specified electrical or dimensional characteristics. Performs on-line go-not-go testing and inspection, using magnifying devices, measuring instruments, and electronic test equipment, to ensure parts and assemblies meet production specifications and standards. May perform assembly operations under microscope or other magnifying device. Occupations related to assembly of printed circuit boards and fabrication of integrated circuit chips are defined under separate definitions.

726.684-070 PRINTED CIRCUIT BOARD ASSEMBLER, HAND (comm. equip.; electron. comp.; inst. & app.; office machines)
Performs any combination of following duties in assembly of electronic components onto printed circuit boards (PCB's) according to specifications, using handtools: Reads worksheets and wiring diagrams, receives verbal instructions, or follows sample board to determine assembly duties, and selects components, such as transistors, resistors, relays, capacitors, and integrated circuits. Twists, bends, trims, strips, or files wire leads of components or reams holes in boards to insert wire leads, using handtools. Inserts color-coded wires in designated holes and clinches wire ends, using pliers. Press-fits (mounts) component leads onto board. Places plastic insulating sleeves around specified wire leads of components and shrinks sleeves into place, using heat gun. Crimps wire leads on underside of board, using handtools or press. Applies sealer or masking compound to selected parts of board to protect parts from effects of wave solder process. Solders wire leads and joints on underside of board, using soldering iron, to route and connect lead wires to board and between individual components. Installs heat sinks, sockets, faceplates, and accessories on boards, using handtools. May be designated according to unit installed as Socket Assembler (electron. comp.) or stage of production as Post-Wave Assembler (electron. comp.); Pre-Wave Assembler (electron. comp.). May assist other workers in wave-soldering PCB's.

726.684-106 TESTER, WAFER SUBSTRATE (electron. comp.)
Tests semiconductor wafer substrate, using testing equipment, such as probe tester, spectophotometer, and curve tracer, to evaluate electrical characteristics of wafer substrate: Places wafer, using tweezers, on test equipment that measures electrical characteristics of wafer substrate, such as resistivity, capacitance, and

>voltage. Starts equipment and observes equipment readout to determine wafer electrical measurements. Records measurements in production log. Compares measurements with specification sheets to determine if wafer substrate meets company standards. Sorts, boxes, and labels tested wafers. Delivers wafers and process sheets to production line workers. Maintains production records. May inspect wafer substrate surfaces, using ultraviolet lamp, to detect scratches and contamination.

Each of these indicated occupations requires "close-up" work involving sustained concentration, using small objects handled with tweezers or in reliance on microscopes, vacuum wands and similar implements, as well as repetitive bending from the neck, all of which is directly contra-indicated by Plaintiff's symptoms of headaches, migraine headaches, dizziness and nausea, light sensitivity, as well as limitations on her neck movements.  The TSA makes no reference to any of the relevant medical records in determining what definitional activities Plaintiff could actually hope to perform as a full-time employee.  More importantly, there is no indication that Defendant made any inquiry of its own of the TSA findings and the relationship between the occupational definitions and Plaintiff's symptomology as evidenced in the medical record.

It is worth noting that Plaintiff's own prior employment description, as referenced in the TSA, is strikingly similar to those recommended as alternative jobs she could supposedly perform:

>590.684-042 INTEGRATED CIRCUIT FABRICATOR (electron. comp.)
>alternate titles: wafer fab operator
>Performs any combination of following tasks to fabricate integrated circuits on semiconductor wafers according to written specifications: Loads semiconductor wafers into processing containers for processing or into inspection equipment, using tweezers or vacuum wand. Cleans and dries photo masks and semiconductor wafers to remove contaminants, using cleaning and drying equipment. Inspects photo masks and wafers for defects, such as scratches, using microscope, magnifying lens, or computer-aided inspection equipment. Deposits layer of photoresist solution on wafers, using automated equipment. Aligns photo mask pattern on photoresist layer, exposes pattern to ultraviolet light, and develops pattern, using specialized equipment. Alters electrical nature of wafer

> layers according to photo mask patterns to form integrated circuits on wafers, using equipment, such as acid baths, diffusion furnaces, ion implant equipment, and metallization equipment. Removes photoresist from wafers, using stripping chemicals and equipment. Inspects and measures circuitry for conformance to pattern specifications, using microscope with measuring attachment. Tests functioning of circuitry, using electronic test equipment and standard procedures.

It is simply not plausible to argue, as Defendant inherently must, that Plaintiff is disabled from her own occupation, but can perform these alternative positions, which coincidentally happen to pay wages at or just slightly above the 50% of pre-disability salary necessary to preclude Plaintiff's benefits.

Defendant's failure to refer to such definitions, (which are clearly in issue), or analyze them in light of the medical record and Plaintiff's symptomology, in effect, simply relying on the TSA's conclusions without engaging in its own review, constitutes a clear basis to find the denial of benefits to be unsupported by the evidence, and an arbitrary and capricious result.

As stated, the TSA also makes reference to the FCE (Ex. 4/p. 00382-386) which conclusions fly in the face of logic and reason given Plaintiff's well established symptoms.  Is it even remotely reasonable to conclude that Plaintiff, who is prone to sudden onset headaches, dizziness and nausea, should engage in ladder climbing?  The FCE also provides for Plaintiff to lift weight well in excess of her neurologist's 10 lb. weight restriction.  Ms. Marshall is a middle-aged woman whose Dr's have indicated that her symptoms are "a very major problem for her," (Ex. 4/p. 00331-332), and are aggravated by neck movement or sudden movements, even if she is lying down or sitting down."   Dr. Lutz, an ENT consult, indicates that Ms. Marshall's symptoms are aggravated by factors that include rolling to the left or right in bed, with dizziness starting "immediately with position change." Dr. Lutz specifically notes that Ms Marshall's symptoms are "severe," and "severely interferes with daily activities." (Ex. 4/p.00333-334, emphasis supplied).

13

Defendant's reliance on the records of Plaintiff's neurologist, Dr. Evelyn Flores, is likewise selective and self-serving. Defendant continues to deliberately distort and "cherry-pick" those items in the record that support its denial, while failing to give proper credit to the overwhelming majority of the evidence to the contrary. For example, while the defendant relies on Plaintiff's neurologist, Dr. Evelyn Flores' comment, (in her letter of April 17, 2001 to Plaintiff's primary physician, Dr. Kang, Ex. 4/00339-340), that Ms Marshall "had learned to treat the different aspects of her headache with Cyclobenzaprine…and Imitrex…." that statement does not indicate that the treatment is consistently successful in alleviating her symptoms, or that the medication allows her to return a more normal level of functioning, let alone employment. This is characteristic of Defendant's justification for its denial—stretching the import of isolated remarks in Plaintiff's medical records, as against the overall weight of those records and treatment history. In Plaintiff's disability statement, (also dated 4/17/01), (Ex. 4/ p. 00451-453), Defendant seizes on several apparent contradictions in Dr. Flores' comments, ignoring their ambiguity, and simply asserting that they mean what Defendant wants them to. For example, Dr. Flores indicates that Plaintiff was totally disabled from "July 2000 to Present," but at the same time indicates that she could be a candidate for "trial employment," provided she adheres to a 10 lb. weight restriction and "no undue neck extension/flexion." Such restrictions are far greater than those allowed in the FCE, or referred to in the TSA to justify Plaintiff's supposed employability.

Additionally, Defendant's failure to refer Plaintiff to an independent physician to clarify these discrepancies one way or the other is evidence of its disregard for the facts, so long as it thought it had some justification to meet a reasonableness standard. Further proof of this is contained in Defendant's denial on internal appeal.

While Defendant's denial on appeal is significantly more detailed in its recitation of the medical record, its conclusion is again based on the same selective and limited justifications. (Ex. 4/p. 00155-158). For example, while Defendant references Plaintiff's Award of Social Security Disability benefits, it gives no weight or consideration whatsoever to that determination.

Finally, Defendant's failure to review or respond to additional materials provided by Plaintiff's counsel, despite Defendant's receipt and acknowledgment, (Defendant's correspondence dated March 8, 2002, Ex. 4/p. 00064-65), coupled with assurances that the same would be reviewed and responded to promptly, is further proof that Defendant's handling of Plaintiff's claim was characterized by a disregard for its merits, beyond that minimally necessary to provide some plausible justification for its denial.

## IV.   CONCLUSION

Since June of 2000, Plaintiff, Birda Marshall, has suffered with sudden onset headaches, dizziness, nausea, light sensitivity, vertigo, migraine headaches, and cervical disc disease which make it difficult for her to simply live her life, let alone engage in gainful employment. For one year from the approximate date of onset of these symptoms, Ms Marshall enjoyed a Short Term Disability benefit provided through her employment at Lucent Technologies. She was improperly denied a comparable Long Term Disability benefit upon the most specious reasoning.

The Administrative Record herein is replete with overwhelming evidence that Ms. Marshall is disabled under any reasonable interpretation, including that provided for in the Lucent LTD Plan. For all of the reasons aforementioned, Defendant's actions in denying this claim are unreasonable, erroneous, and unsupported by substantial evidence, rendering them violative of the arbitrary and capricious standard applicable to this court's review. For these reasons, Plaintiff prays this honorable court grant the within motion and Order Defendant to

provide her with full benefits under the LTD Plan, retroactive to her original date of application, along with reasonable counsel fees and costs of prosecution of this action.

                                Respectfully submitted,

                                Sagot, Phillips, Brooke & Cornett

                        BY:<u>SP1572</u>_____
                            STUART J. PHILLIPS, ESQUIRE

                            Two Greenwood Square, Suite 225
                            3331 Street Road
                            Bensalem, PA  19020
                            (215) 633-1800

**CERTIFICATE OF SERVICE**

I, Stuart J. Phillips, hereby certify that on October 29, 2004, I have caused a copy of the foregoing Plaintiff's Motion for Summary Judgment with supporting Memorandum of Law to be served upon the following person by depositing a true, correct and complete copy of same in the United States Mail Service, First Class, postage prepaid, addressed to:

Elizabeth A. Venditta, Esquire
White and Williams
1800 One Liberty Place
Philadelphia, PA 19103-7395

Attorney for Defendant Connecticut
General Life Insurance Company

Date:  October 29, 2004

                                              STUART J. PHILLIPS, ESQ.